## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO: 0:16-CR-60227-HURLEY

UNITED STATES OF AMERICA

v.

CHRISTOPHER MUCHA

_____/

### DEFENDANT CHRISTOPHER MUCHA'S SENTENCING MEMORANDUM

Defendant CHRISTOPHER MUCHA, through counsel, respectfully submits this Sentencing Memorandum in advance of his March 23, 2017, sentencing hearing. This Memorandum incorporates a request for a downward variance from the guidelines range ultimately determined by the Court.

## I.      INTRODUCTION

Christopher "Chris" Mucha -- a young man with no criminal record who has suffered an unimaginable tragedy in his life -- will be sentenced by this Honorable Court in connection with his guilty plea to one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §371. The offense arose out of his employment at NuMed, a health care company where he started as a shipping clerk in July 2014 and worked for a total of 13 months, ultimately becoming a liaison with physicians.

The statutory maximum is 60 months. There is no mandatory minimum. Mr. Mucha has filed a motion for downward departure under *United States v. Rodriguez*, 64 F.3d 638 (11th Cir. 1995). Moreover, it is anticipated that the government will be filing a motion pursuant to U.S.S.G. §5K1.1 based on Mr. Mucha's substantial assistance to the government. Given the unique circumstances described below and his extraordinary cooperation, and considering all

1

the factors outlined in 18 U.S.C. § 3553, we hope to persuade the Court that the appropriate disposition of this case is a non-prison sentence of probation with a component of house arrest.

## II.      BACKGROUND

An analysis of the §3553 factors, as they pertain to Chris Mucha, require an understanding of his background and history, as well as his mental state before he had the great misfortune of joining NuMed in July 2014. The clear picture that emerges is of someone who, through a combination of tragic circumstances and naiveté, became entangled in a fraud designed by others, and he lacked the emotional strength and guidance to back out. The picture also emerges of someone who, after the law enforcement raid on NuMed, immediately accepted responsibility and proactively cooperated with the government's investigation to a degree that is virtually unprecedented in this district. His cooperation has been nothing short of phenomenal and has produced – and will continue to produce – extraordinary results.

### A. Chris Mucha's Childhood[1]

By all accounts, Chris Mucha's childhood was like many others. He was born and raised in Broward County, Florida, and graduated from Western High School in 2004. He was outgoing and had many friends. He loved adventure. He attended sporting events as a child -- especially Miami Dolphins games -- and was a diehard Dolphins fan. He never used drugs.

And, he had the prototypical nuclear family. He had two parents who loved him and a younger sister, Samantha, who he adored. His mother Norma was a school teacher, who coddled and protected him, handling all the necessities of his life. Chris's father Michael Mucha was a larger than life character; he was a businessman but also a trained pilot who

---

[1] Throughout this memorandum, Mr. Mucha will be referred to as "Chris" or "Christopher" to maintain consistency with the numerous letters that are quoted herein.

owned and operated ATA Flight School at North Perry Airport. Chris's dream was to follow in his father's footsteps as a pilot. During high school, Chris had taken "flying lessons and after graduation [] focused on logging hundreds of hours of air time for his flight ratings and commercial pilots license."  (Alfie Hamilton Letter). [2] By late 2006 – at the age of 20 – Chris had already obtained his private pilot's license, his multi-engine license, complex pilot's license and had taken the written portion of his instrument license exam; he had only to take the flying portion of the instrument license, scheduled for early 2007. "He was well on his way towards realizing his dreams as a corporate pilot." (Alfie Hamilton Letter). Chris adored his father Mike; they "spent many hours together learning to fly airplanes, going to car shows, working together or just hanging out at the house." (Karen Riggle Letter). Mike "taught Christopher to fly and they were in separable." (Lawrence P. Calabrese Letter).

### B.   Chris Loses His Entire Immediate Family

**On Christmas day of 2006 all of our hearts dropped when we received the news of Mike, Norma, and Sam's airplane accident in which they lost their lives.** (Sean Swift Letter)

On December 25, 2006, Chris's life, and the world as he knew it, was devastated when he learned that the small plane his father had been piloting had crashed in Georgia, and that his parents and younger sister had perished. Chris's family was "on their way to visit extended family for the Christmas holiday" when "the small plane they were travelling in crashed in bad weather in Georgia." (Michael Wallace Letter). "His dad was piloting the plane and they crashed just 1100 feet left of the runway on landing." (Kelly Mucha Letter). By some miracle, Christopher and his then girlfriend Kelly "were supposed to be on that plane as well but at the

---

[2] Some of the letters contain grammatical and typographical errors. Undersigned did not correct the errors in the quoted passages in order to preserve the genuineness of the thoughts expressed.

last moment, didn't go as Chris had work." (Barbara Roach Letter). "Christopher's entire life turned upside down in a matter of moments." (Maryann Bills Letter). "He lost everything that night… Because he was so sheltered it made the loss of his parents even more painful." (Juliann Dwares Letter).

> I have never witnessed something so horrific and sad in my life and hope no one has to go through what he did.  I witnessed him going through the crash site remaining wreckage pieces and finding pieces to his family members and blood piles.  Then hugging very deformed bodies in plastic bags at the funeral home before the closed casket wake.  The loss had such a tremendous effect on him and overnight his whole life changed. (Daniel Gizzi Letter).

Thus, in an instant, Chris went from a happy-go-lucky kid to being a 20-year old orphan.

> For Chris, a sensitive young man barely 20 still living at home with his family, this was total devastation. His whole world was gone. It was raw pain and deep emptiness. I do not believe I have ever witnessed someone so utterly devastated. It was as if he had been gutted. To make matters worse, since this tragedy happened on Christmas day, it not only made him an orphan, it also destroyed Christmas. Imagine, the most joyful season of the year turned into the most dreaded. Christmas became a time of great sadness not joy. Christmas has always been a melancholy time for me, but for Chris, who valiantly tried to hide his pain by going through the motions of wishing everyone a "Merry Christmas", it opens great wounds.  (Kathy Hamilton Letter).

To this day, Chris unfairly holds himself responsible, believing that, had he made the trip with his family, he could have helped his father navigate through the inclement weather that claimed their lives. For years following the crash, "Chris suffered with the guilt that he was not on that plane as he felt he could of somehow saved his family." (Barbara Roach Letter).

> If only he had made a different decision; had he joined them on that flight to Georgia and was in the co-pilot seat next to his Dad, just like he had been so many times before, certainly everything would have been fine.  Together Chris and Mike would have met the aviation challenges that night presented and landed the plane.  He will forever believe that he made the wrong choice and as a result lost his family.  (Alfie Hamilton Letter).

Not surprisingly, Chris gave up his dream of becoming a pilot: "he felt he could no longer study to be a pilot as this would be a constant reminder of what happened to his family." (Barbara Roach Letter). "He was forced to become an adult over night when most kids his age were worrying about studying for a college test they might have the next day." (Rachel Spatafora Letter). Chris had little college education and, coping with deep depression, Chris was now forced to fend for himself without the guidance of his parents. Chris "had very devoted parents, they took care of everything for him. They were helicopter parents for sure." (Juliann Dwares Letter). Norma "did everything for her children, laundry, put money in their bank accounts, cooked, cleaned and so much more." (Karen Riggle Letter). Norma "always said she would teach her children all the things she did for them when it was time, but that time never came." (Karen Riggle Letter).

Chris "went from a carefree twenty year old to a young man left to deal with this extreme tragedy and to figure out alone how to get on with his life." (Nancy Reed Letter). "He had no idea [how] to function day to day." (Michelle Reagan Letter)." Unfortunately, Chris was not equipped "with any life skills that he needed to survive." (Maryann Bills Letter). He "didn't even know how to work the washing machine, write a check or use the ATM." (Maryann Bills Letter). Chris's aunt Michelle Reagan recalls "personally observ[ing] him on one particular occasion how he tried to take money from an ATM only to discover that there was a zero balance. He stood there with a blank look on his face & said 'now that they are gone, how do I get my money out.' He had no idea how a checking account worked or how to pay a bill.  There was a whole house that HE was now responsible for and he had NO idea how to run it." (Michelle Reagan Letter). Chris has "had to endure terrible financial hardship with the mortgage of the family home, bills, insurance premiums, taxes, taking care of himself,

household duties and the distress of liquidating the family business, etc." (Barbara Roach Letter). These were "all the responsibilities that his parents had" managed for which he was now responsible. (Alfie Hamilton Letter).

When "Norma, Mike and Samantha died, Christopher had no idea which way to turn" (Karen Riggle Letter) and "no one to guide or watch over him." (Jeffrey W. Reagan Letter). "Norma gave him and did everything for him. When she passed, a part of him passed as well. He was oblivious to life." (Michelle Reagan Letter). "He now lived in a house that used to be filled with laughter, love, and his family, by himself." (Kelly Mucha Letter). "For the first couple of years following the crash he lived in his family's home, yet he remained in his childhood room surrounded by all his family's possessions which he couldn't bear to remove or touch." (Alfie Hamilton Letter).

"He was lost for so long and had no idea what to do." (Karen Riggle Letter). Chris's aunt Karen Riggle recalls "watch[ing] him go through his life for so long… sad and unable to get out of bed or go out of the house." (Karen Riggle Letter). Chris "went through a deep depression and I know the pain is still there." (Greg Jones Letter). "He has had severe anxiety and depression since then and has never been to talk to anybody about the things he has been through. I've heard him call out his family's names while sleeping and wake himself up screaming because his nightmares have been so bad." (Kelly Mucha Letter).

With no business experience, and battling deep depression, Chris began to work at his father's roadside assistance company with his father's former business partner. But that venture failed, as Chris lacked experience to operate the business. He went nine months without drawing a salary, yet continued "working 6 days a week, 10-12 hours a day because he felt like he was letting his dad and the employees that he knew down." (Kelly Mucha Letter).

### C.   Chris Gets Married and Has Children

During these stressful times, Chris's high school sweetheart, Kelly Jones, was there to support him every step of the way. Without Kelly, Chris would not have survived. Ultimately, they married and had two little girls, the first in 2012 and then the second 15 months later. "We call them our 'Irish Twins.'" (Kelly Mucha Letter). "Chris and Kelly were so excited when they realized they were expecting as Christopher felt he would have a family again." (Barbara Roach Letter). With a new baby on the way, Chris's "pre-crash charm, charisma and outgoing demeanor [] start[ed] to return." (Alfie Hamilton Letter).

> **When his first daughter [] was born I remember holding her in Kelly's hospital room and Chris looking at me and said 'I finally have a reason to smile Granny.'** (Maryann Bills Letter)

Now "he literally lives for his family, they are everything to him. The tenderness and joy he gives and receives from his girls always warms my heart." (Maryann Bills Letter). Notwithstanding "living with a huge void and no support system of immediate family, he has married and become a father. He has singlehandedly found his way to become a successful, productive adult, when many people would have given into the trauma and simply given up on life." (Cindy Schutt Letter).

### D.   Chris Joins NuMed in 2014

With "a wife, toddler and newborn at home" Chris had "to figure something out to pay the bills." (Rachael Spatafora Letter). In July 2014, Chris's luck seemed to change when his high school friend Tim Clinton offered Chris an opportunity to work at NuMed as an entry-level clerk in the shipping department, doing data entry for $15 per hour. NuMed was a compound pharmacy management company that had been in existence for several years and specialized in processing compound pain medicine. By all measures, NuMed appeared to be a

7

legitimate successful company when Chris was interviewed for employment. NuMed had a corporate office structure that employed more than a hundred employees. It had a human resources department, an in-house legal department, and outside lawyers. And it was operating in the highly-regulated field of healthcare.

Chris had absolutely zero knowledge, experience, and training in the healthcare field. He was unaware of the anti-kickback laws and knew virtually nothing about compound pain cream and insurance reimbursements rates. When Chris started as a shipping clerk, he had no reason to question NuMed's legitimacy. To the contrary, he observed many of his NuMed peers enjoying great financial success and he believed he had finally landed in a safe place to support his family.

Although he "has only a high school education and limited work experience," he "was eager to learn. He was hungry for an opportunity to create his own success." (Alfie Hamilton Letter). Chris "wanted to rise through the ranks so that he too could prosper like his trusted friends and co-workers." (Alfie Hamilton Letter).

After working extremely hard putting in overtime, Chris was promoted to a better paying position assisting the sales representatives. His efforts impressed his superiors and he was subsequently offered a position with ClinicalCorp, a NuMed-affiliated entity headed by Todd Hanson. Chris was not a founder of ClinicalCorp nor did he come up with the idea. Ostensibly, ClinicalCorp was established by NuMed to pay physicians $200 per hour in time increments to collect data for the then-imminent medical code conversion from ICD-9 to ICD-10.[3] ClinicalCorp claimed that it was contracting with physicians to purchase data to be used

---

[3] ICD stands for International Classification of Diseases. ICD codes are used to properly note diseases in health records to assist with medical reimbursement decisions.

to develop software for medical coding.  Chris was tasked by his superiors at the company to be the liaison with the physicians to ensure that physicians were being paid and providing the data as contractually required.

At first, Chris had no reason to believe this arrangement was illegal or fraudulent. The structure of paying physicians for data had been established with the knowledge and assistance of in-house counsel. Additionally, the funds initially being paid to the physicians went through the ADP payroll company, providing Chris with even more comfort in their legitimacy. Eventually, however, Chris came to realize that ClinicalCorp was doing nothing with the data it was collecting. Even more significant, Chris learned that physicians who failed to write sufficient prescriptions for compound pain creams were being terminated from the program. Thus, it became obvious to Chris that the data collection was a ruse and that the physicians were effectively being paid kickbacks in exchange for writing prescriptions.

Chris convinced himself that the involvement of lawyers in the business plan would provide him with the protection he needed, even though he knew that physicians were being paid for writing prescriptions, and not for the "data." Chris lacked the self-confidence to challenge the decision-makers at the company. Moreover, by this point, Chris was earning more money (through commissions) than he could have ever imagined – his adjusted gross income for 2015 was $312,996 (PSR, at ¶100) -- and began to dream about earning the kind of money that others were at the company. He had suffered so much pain in his life that the thought of having to start over at a new job was simply too daunting. "Sadly, perhaps due to the absence of guidance of his parents, Chris place[d] too much trust in others." (Alfie Hamilton Letter). "Now his biggest regret is ever getting involved in the company."  (Kelly Mucha Letter).

E.   **Chris's Acceptance of Responsibility and Cooperation**

In August 2015, law enforcement authorities raided NuMed's offices. Chris immediately accepted responsibility for his conduct and began cooperating with the authorities. He eventually waived indictment and pleaded guilty to an Information, thereby saving the government substantial resources. He has never denied his conduct in this case. He has shown extreme remorse for his conduct.

His cooperation has been both proactive and historical. As will be detailed further at sentencing, his proactive cooperation has been nothing short of extraordinary and is certainly unprecedented in the 25 years that undersigned counsel has been practicing law. Chris's proactive cooperation was critical to the government's investigation of the corrupt physicians who were writing prescriptions in exchange for kickbacks. Under the ClinicalCorp model, the physicians could credibly defend against any criminal charges, claiming that they believed they were being paid *for data*, not for prescriptions. The physicians could credibly claim they did not know that ClinicalCorp was making no use of the data.

Thus, it was critical to the ongoing investigation for the DEA to obtain direct evidence that the physicians knew they were being paid for prescriptions, not data, and that the "data collection" was a ruse. The DEA agents enlisted Chris – whose job at ClinicalCorp had been to liaise with dozens of physicians – to record his telephone communications with those physicians. During those monitored calls, corrupt physicians: a) confessed on tape that they knew they had previously been paid for prescriptions and not data; b) agreed to write additional scripts in exchange for cash payments; and c) agreed to allow Chris, a non-medical professional, to dictate and even change the types of medications based on the availability of reimbursement rates, not medical necessity.

No other defendant in this case has provided the type of cooperation that Chris provided in this case, to wit:

1. Chris met with federal agents on more than **fifty (50)** occasions to be debriefed, provide information, review e-mails, analyze computer data, and participate in undercover work. Chris explained the inner workings of ClinicalCorp, which enabled the agents to be more prepared for their proffer sessions with the higher-ups at the company. Chris helped the agents understand the scheme with the corrupt physicians. Chris provided excel spreadsheets to the agents which detailed the amount of money paid to the physicians, thereby allowing the agents to target the most prolific physicians.

2. Chris participated in an undercover capacity in **228** consensually-monitored telephone calls and text messages to physicians (approximately 140 of which were recorded telephone calls). As a result, the DEA agents obtained recorded phone calls between Chris and more than **twenty (20)** physicians, many of whom either admitted their past participation in the kickback scheme, wrote additional prescriptions in exchange for money at Chris's behest, or permitted Chris to unlawfully change patient medications that would result in a bonus to the physician. Based on these recorded conversations, DEA agents arranged to directly deliver cash to three corrupt physicians in exchange for prescriptions.

3. Chris took the extreme risk of wearing a recording device for **three (3)** in-person conversations with corrupt physicians. Two of the in-person conversations were in Florida. On a third occasion, Chris traveled to Pennsylvania for a recorded in-person conversation and delivered a cashier's check to a corrupt physician.

Two of the three physicians charged in this case (Johnson and Nadel) were charged as the direct result of Chris's consensual recordings. A third physician (Kennedy) recorded by Chris has been charged with criminal offenses in state court. Three other physicians who Chris recorded, who should remain unidentified for now, are likely facing imminent charges. Thus, **Chris's proactive cooperation and recorded conversations will have directly resulted in criminal charges being filed against at least six corrupt physicians. According to the DEA case agent, five of the six physicians would likely have avoided criminal prosecution altogether but for Chris's cooperation.**

Had Chris's undercover assistance led to the indictment of even a single corrupt physician, his cooperation would be considered substantial. To elicit recorded confessions from six medical professionals who were receiving kickbacks for writing unnecessary pain cream prescriptions is nothing short of extraordinary. Moreover, several of these physicians have been cooperating extensively with the government, which will undoubtedly lead to additional charges against other physicians, all as a derivative result of Chris's cooperation. Thus, Chris's proactive cooperation will have reverberating effects in cleaning up the industry.

Beyond the proactive cooperation, the historical information and documents provided by Chris to the DEA helped the government build its case against more than ten NuMed employees and affiliates who were charged, all of whom have expeditiously resolved their cases. Thus, even without the proactive cooperation, Chris's assistance would have merited a substantial reduction.

Ironically, Chris worked for the DEA longer than he did for NuMed and ClinicalCorp. Kelly Mucha recalls that "[a]nytime [the agents] called, he would drop everything so that he could go help them. He would often decline calls for his job to go into [the DEA] offices, which left us financially strained." (Kelly Mucha Letter). Chris's cooperation is unparalleled in this case. The case agent has described it to undersigned counsel as "phenomenal." No one's cooperation approaches Chris's in its quantity, scope, quality, and results.

### III.  THE §3553 FACTORS

An analysis of the §3553 factors, when viewed together with Chris's cooperation, warrants the conclusion that probation with home confinement is sufficient but not greater than necessary to achieve the purposes of sentencing.

### A.   <u>The Nature and Circumstances of the Offense</u>

There is no doubt that a conspiracy to commit fraud on insurance companies is a serious offense. But there is also no doubt that Chris Mucha did not devise or orchestrate the fraud; rather, he walked into an ongoing fraud without any initial realization or appreciation of it. He did not own NuMed or ClinicalCorp.  He was recruited as a low-level shipping clerk into a company that looked legitimate, and he lacked the experience, self-confidence, fortitude, and guidance to question or confront the fraud when it became apparent to him. Instead, to his deep regret, he joined it. Equally significant, this is one of those cases where the loss being attributed to Chris by the Probation Office ($18+ million) dwarfs his personal financial gain (<$400,000), and a wooden application of the fraud guideline thereby produces an unjustified and exaggerated guidelines range as to him. *See, e.g.,* Derick R. Vollrath, *Losing the Loss Calculation: Toward a More Just Sentencing Regime in White-Collar Cases*, 59 Duke L.J. 1001, 1020 (2009) ("The sentencing of federal white-collar criminal defendants is deeply flawed.  The guidelines recommend sentences that are generally too harsh.  Moreover, the guidelines place undue emphasis on the loss calculation, an imprecise measure that fails to accurately correlate with the defendant's culpability.").

### B.   <u>The History and Characteristics of the Defendant</u>

The tragic circumstances that befell Chris Mucha do not excuse his conduct. But they help explain his mental state when he began to work at NuMed. He was a C student in high school; he had little college education; he was emotionally incapable of pursuing his dream of becoming a corporate pilot; and he did not know or understand the medical field. He was lost, depressed, unemployed, and lacked parental guidance. He was desperately looking for

13

stability. He thought he had found stability in a legitimate, growing, and successful company. He certainly did not believe that his friend had recruited him to work for a fraudulent outfit.

The real Chris Mucha is the loving person described by his family and friends. Chris is "a family man, whether its football season, Christmas, Easter or any holiday, we are always at his house because he wanted his friends and family there with him." (Greg Jones Letter). His "children are the one thing that give Chris his true happiness back." (Kelly Mucha Letter). "Chris often spends an exorbitant amount of time with his children. It's almost as though none of us exist until he has spent quality time with the girls." (David Turner letter). "Before kids his weekends involved video games and cars but now its all about princesses and spending time with his family." (Rachael Spatafora). Chris's wife Kelly describes Chris as a hands-on, proactive father:

> He takes them on daddy/daughter dates, surprises them with ice cream, takes them for bike rides, walks them down to the canal by our house and takes them fishing and builds them bonfires when its cold outside so they can roast marshmallows.  He gives them rides on the lawnmower when he's cutting the grass.  When the holidays come around, he'll sneak home during the day and move around our 'Elf on the Shelf' we named Angel so they think she made a quick trip back to the North Pole to report their behavior.  He'll take the long way home so they can see more Christmas lights… At my daughters school, they didn't have anyone to volunteer for a class and Chris took on the role of teaching the kids about the artist, Michelangelo. (Kelly Mucha Letter).
>
> **If you call him, he will always be there for you, no matter how big or small.** (Kelly Mucha Letter).

Indeed, the common theme that emerges from the letters is that Chris was always willing to lend a helping hand, something he learned from his parents at a young age. After Hurricane Wilma, Chris and his father "[drove] through several neighborhoods offering to help clear brush and provide gas for generators free of charge." (Susan Calabrese Letter). This gas

came from "the planes at his fathers flight school." (Kelly Mucha Letter). Childhood friend

Sean Swift writes that

> At one point I had a hard time finding a job and he quickly offered to hire me at his dads company. Even though I hated the job and the hours [] I was very thankful to have an income and be able to pay my bills and have food while I was still on the search to reaching my goals. I always witness him spending a lot of his time lending a hand to helping others. (Sean Swift Letter)

Chris's brother-in-law, Greg Jones tells a similar story about how Chris "personally

helped me out when I was going thru a hard time with work and my now wife. We split up and

I was out of work for a little while. Chris let me stay at his house rent free, knowing I was

having money issues." (Greg Jones Letter).

Chris "also used his life insurance money to help [his] grandfather when he fell behind

on his property taxes and the mortgage on his house." (Lindsey Hamilton Letter). "He is the

type of individual who literally would give you the shirt off his back. I know of one instance

when he generously helped a friend whose father was in need of money." (Kathy Hamilton

Letter). Daniel Gizzi writes that Chris has "co-signed for my sister's bar exam loan" and "has

kept my father employed for nine years at his family's roadside service company." (Daniel

Gizzi Letter). As Mr. Gizzi "live[s] in Georgia now," Chris "literally handles all the tasks my

parents need help with that I cannot physically be there to do." (Daniel Gizzi Letter).

Not only is Chris heavily dedicated to his own children, but as Michelle Reagan writes,

he "has participated in fundraising events for my children and has spent numerous hours

teaching my son [] video games." (Michelle Reagan Letter). When Greg Jones' car was stolen,

he recalls that Chris "let me borrow his… He said I can use it for as long as I needed until I

get a replacement." (Greg Jones Letter).

When Chris's "grandpa recently fell ill while in the process of selling his house[,]" Chris "packed up the entire house for him and held a garage sale to get rid of unwanted items." (Kelly Mucha Letter). Chris's friend Rachael Spatafora writes that "there have been countless times I have called him because I had a flat tire or was having car trouble and he would just ask where I was and tell me he'd be on the way." (Rachael Spatafora Letter). "If he can't help you, he'll look up someone who can and recommend them and make sure you have what you need before he gives up." (Kelly Mucha Letter).

Christopher Mucha has been humbled by this experience. Although his friends and family were shocked when they heard about this case, "Chris did not try to and blame the others or the investigators." (David Turner letter). "He has taken responsibility for his actions, he has fallen on the sword and he has sought forgiveness from those who his negative decisions have affected." (Michael Wallace Letter).

"Sometimes money can blind us to the reality of a situation and/or actions." (Sean Swift Letter). This is truly the case with Chris Mucha. "Chris was not happy with his work environment and given the very unfortunate situation he was put in very early in his life was not able to continue with school." (Sean Swift Letter). Chris saw NuMed as "an opportunity to get out of the work environment he was in as well as a good opportunity to send his girls to good schools in the future and take care of his family." (Sean Swift Letter). However, what little he had before joining NuMed, he has lost and literally has nothing now but his family.

### C.    Punishment, Deterrence, Protection of the Public

The Supreme Court recognized in *Gall v. United States*, 552 U.S. 38 (2007), that fashioning a sentence "to promote respect for the law," 18 U.S.C. §3553(a)(2)(A), does not invariably point towards ***harsher*** sentences. Referring to the "unique facts of Gall's situation"

– which included his voluntary rehabilitation – the Court agreed that "a sentence of imprisonment may work to promote not respect, but derision, of the law, if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54.

That would be true here as well. Chris Mucha, a young man with virtually no higher level education, emotionally distraught and without direction, unwittingly walked into a fraudulent operation that appeared to be legitimate. NuMed had hundreds of employees, a legal department, and a real corporate structure. Chris did not know any better. He thought this was corporate America. And, when it finally occurred to him that the company was engaged in widespread fraud, he lacked the emotional maturity and guidance to walk away.

He will forever pay for his transgression in many ways, the most obvious of which is that his current situation has derailed his recovery from the depths of depression. Chris Mucha needs mental health counseling, not federal prison. Having been permanently separated from his entire immediate family ten years ago, he now lives in a state of fear and panic that he will be removed from the only three people – his wife and two daughters – that have enabled him to deal with his pain and unspeakable grief. Any sentence of imprisonment will be another tragic loss for Chris Mucha. And, it will be a tremendous loss for his wife and two daughters.

> **I can't even begin to tell you how heartbreaking it will be for the girls to stare out the window and wait to run to their daddy and him not to be there trying to explain his absence.** (Barbara Roach Letter)

Although Chris recently started his own company, Affordable Roadside Service, he has put most of his time and energy over the last year into assisting the government with its investigation. Chris is barely making enough to support his family; his wife Kelly who had previously stayed home with his daughters, has now been forced to find supplemental income,

which nonetheless barely covers their expenses. The Muchas are raising their children without any consistent, reliable financial support. In addition to the emotional void it would leave if Chris was sentenced to ***any*** amount of prison time, his wife and children will endure a substantial financial burden.

The deterrence factor "unquestionably envisions more severe sentences for defendants considered more likely to commit further crimes and less severe sentences for those unlikely to commit crimes." *United States v. Rodriguez*, 724 F.Supp. 1118, 1120 (S.D.N.Y. 1989). Chris Mucha's "lack of criminal history, even though already taken into account in calculating his advisory guideline range, could nevertheless [] form[] the basis for a variance." *United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009); s*ee also United States v. Howe*, 543 F.3d 128, 137 (3d Cir. 2008) (upholding district court's reliance "on seven reasons to justify its downward variance" including the fact that defendant "'led an honorable and lawful life until this point' and had no prior criminal history"); *United States v. Cabrera*, 567 F.Supp.2d 271, 279 (D.Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders").

Furthermore, Chris Mucha's personal circumstances and the unlikelihood of recidivism are permissible factors to support the downward variance. *See, e.g., United States v. Shanshan Du*, 570 Fed. Appx. 490, 508 (6th Cir. 2014) (downward variances based on multiple reasons, including unlikelihood of recidivism and history of persecution in China); *United States v. Parker*, 06-20050, 2007 WL 1544403, *7 (E.D. Mich. May 25, 2007) (variance "reasonable because Defendant's work history, volunteerism, the unlikeliness of recidivism, his limited criminal history and the nature and circumstances of the offense all suggests that the applicable Guideline range is greater than necessary to accomplish the dictates of § 3553(a)").

Chris Mucha's heartrending story is almost too difficult to fathom.  His life and career path crashed along with his family in the small airplane on Christmas day.  He ultimately found happiness in starting his own family with his wife and two beautiful daughters. Having finally gotten his life back on track with a steady paying job to support his family, he now faces a second incomprehensible tragedy. The enormous emotional devastation that Chris has already had to deal with in his life, compounded by the distress of the NuMed disaster, are certainly factors that the Court may consider when imposing sentence, whether as a downward variance or a departure from the guidelines under U.S.S.G. §5H1.3 ("Mental and Emotional Conditions").  *See United States v. Somerstein*, 20 F. Supp. 2d 454, 464 (E.D.N.Y. 1998) (granting downward departure to probation for a defendant who was convicted by a jury of masterminding a scheme to defraud employees of her catering business of pension benefit contributions; the defendant was a Holocaust survivor who lost half her family, and the Court "[could not] see incarcerating this woman for this type of offense after what she has been through."); *United States v. Lopez*, 938 F.2d 1293, 1297-99 (D.C. Cir. 1991) (remanding case to district court to determine whether departure warranted based on defendant's rough history including his mother being killed by his stepfather, exposure to domestic violence, and growing up in poverty).

### D.      The Kinds of Sentences Available and the Sentencing Range

A sentence of probation is authorized as a matter of law.  Moreover, given the statutory maximum, the anticipated §5K1.1 motion, the advisory nature of the guidelines, Chris Mucha's late-entry into the fraud, and his personal circumstances, this Court would be well within its discretion to impose a sentence of probation with a condition of home confinement and mental health counseling.

19

E.       **The Need to Avoid Unwarranted Sentence Disparities**

Chris Mucha will be the first defendant in the NuMed case to be sentenced by the Court. As such, the Court will not be in a position to measure Chris's sentence against the sentences *actually* imposed against those who are more culpable, profited far more than the scheme, and provided far less assistance to the government. Nonetheless, undersigned counsel feels comfortable in making the following representations to the Court, upon information and belief:

1.       Chris Mucha made *less* money from the scheme than all of the other NuMed and ClinicalCorp employees and sales representatives charged in this case, and perhaps even less than one or more of the outside physicians;

2.       Chris Mucha worked for NuMed and Clinical Corp for *less* time than all of the other employees and sales representatives charged in this case, and even for less time than two of the three outside physicians;

3.       Chris Mucha is the most significant cooperator in this case. No other defendant has even come close to providing the type of cooperation assistance, either in quantity or quality, that Chris Mucha has;

4.       Although undersigned counsel cannot speak to the life circumstances of others charged in this case, it is safe to say that Chris Mucha's personal life story is especially unique and tragic; and

5.       Unlike the physicians in this case, Chris Mucha did not have a professional medical license, college degree, or a background in healthcare when he joined NuMed.

Stated simply, a sentence of probation for Chris Mucha, with a component of home confinement and mental health counseling, will not open the floodgates to others *legitimately* using Chris Mucha's sentence as a basis for arguing co-defendant disparity. Chris Mucha's situation is different.   His cooperation was extraordinary. His life story is compelling. Undersigned counsel believes the prosecutors will agree that, to achieve the appropriate proportionality in this case, Chris Mucha's sentence should be at the low end of the charged defendants.

## IV.  <u>CONCLUSION</u>

Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. **The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense.** Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

*United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) *aff'd*, 747 F.3d 111 (2d Cir. 2014) (emphasis added).

For the foregoing reasons, Chris Mucha respectfully requests that this Honorable Court impose a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing. We request that the Court vary downward from the guideline range and impose a sentence of probation with a component of home confinement and mental health counseling.

Respectfully Submitted,

**SCOTT A. SREBNICK, P.A.**
201 South Biscayne Boulevard, #1380
Miami, Florida 33131
Email: scott@srebnicklaw.com
Phone: (305) 285-9019

/s/ Scott A. Srebnick, Esq.
**Scott A. Srebnick, Esq.**
(FL Bar No. 872910)

s/ Daryl A. Greenberg, Esq.
**Daryl A. Greenberg, Esq.**
(FL Bar No. 90904)
Email: daryl@srebnicklaw.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on March 16, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s Scott A. Srebnick, Esq.
Scott A. Srebnick